UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Case No. 08-30049

| | |
|---|---|
| THOMAS TOUPONCE,<br>    Plaintiff<br><br>v.<br><br>TOWN OF LEE; PLANNING BOARD OF THE TOWN OF LEE; DONALD R. TORRICO, INDIVIDUALLY AND IN HIS CAPACITY AS BUILDING INSPECTOR FOR THE TOWN OF LEE; GORDON D. BAILEY, INDIVIDUALLY AND IN HIS CAPACITY AS CHAIRMAN OF THE BOARD OF SELECTMEN OF THE TOWN OF LEE; MARTIN H. DEELEY, INDIVIDUALLY AND IN HIS CAPACITY AS A MEMBER OF THE PLANNING BOARD OF THE TOWN OF LEE; DAVID DURANTE IN HIS CAPACITY AS A MEMBER OF THE PLANNING BOARD OF THE TOWN OF LEE; THOMAS SWIFT IN HIS CAPACITY AS A MEMBER OF THE PLANNING BOARD OF THE TOWN OF LEE; ALDO PASCUCCI IN HIS CAPACITY AS A MEMBER OF THE PLANNING BOARD OF THE TOWN OF LEE; AND ANTHONY CAROPRESO IN HIS CAPACITY AS A MEMBER OF THE PLANNING BOARD OF THE TOWN OF LEE,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   PLAINTIFF'S MEMORANDUM<br>IN OPPOSITION TO<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT |

The plaintiff, Thomas Touponce ("Mr. Touponce"), hereby opposes the defendants'

Motion for Summary Judgment for the reasons set forth below.

<u>FACTUAL BACKGROUND</u>

Mr. Touponce hereby incorporates his response ("Response") to the defendants' Concise

Statement of Undisputed Material Facts ("Concise Statement").

PARTIES AND CLAIMS

The Complaint filed by Mr. Touponce asserts eight separate claims against nine separate defendants.  The defendants named in Mr. Touponce's Complaint are:

1.    The Town of Lee ("the Town");

2.    The Planning Board of the Town of Lee ("the Planning Board");

3.    Donald R. Torrico ("Mr. Torrico"), individually and in his capacity as building inspector for the Town of Lee;

4.    Gordon D. Bailey ("Mr. Bailey"), individually and in his  capacity as chairman of the Board of Selectmen of the Town of Lee;

5.    Martin H. Deeley ("Mr. Deeley"), individually and in his capacity  as a member of the Planning Board of the Town of Lee;

6.    David Durante ("Mr. Durante"), in his capacity as a member of the Planning Board of the Town of Lee;

7.    Thomas Swift ("Mr. Swift"), in his capacity as a member of the Planning Board of the Town of Lee;

8.    Aldo Pascucci ("Mr. Pascucci"), in his capacity as a member of the Planning Board of the Town of Lee; and

9.    Anthony Caropreso ("Mr. Caropreso"), in his capacity as a member of the Planning Board of the Town of Lee.

As an initial matter, Mr. Touponce wishes to stipulate that he does not object to the dismissal of his claims against the Planning Board (since it is merely a Town agency) or Messrs. Torrico, Bailey, Deeley, Durante, Swift, Pascucci and Caropreso in their official capacities (because they are the Town's alter egos when acting in that capacity).  Nor does he object to the dismissal of his claims against Mr. Deeley individually.  Hence, the discussion that follows will focus exclusively on his claims against:

1.    the Town;

2.      Mr. Torrico in his individual capacity; and

3.      Mr. Bailey in his individual capacity.

Having identified who the relevant defendants are, Mr. Touponce will now briefly address the

nature of his claims and who each of them is intended to be asserted against.

As previously stated, Mr. Touponce's Complaint consists of eight separate counts.  Those

counts assert the following claims:

Count I:        Violation of 42 U.S.C. § 1983
                (Selective Treatment)

Count II:       Violation of 42 U.S.C. § 1983
                (Refusal or Neglect to Prevent Selective Treatment)

Count III:      Violation of 42 U.S.C. § 1983
                (Municipal Liability Based on Custom or Policy)

Count IV:       Malicious Prosecution

Count V:        Abuse of Process

Count VI:       Tortious Interference with Advantageous Relations

Count VII:      Violation of Massachusetts Civil Rights Act

Count VIII:     Violation of Massachusetts Declaration of Rights

These eight counts, in turn, can be broken down into three general categories:

1.      Counts I–III assert federal civil rights violations under 42 U.S.C. § 1983;

2.      Counts IV–VI assert tort claims under Massachusetts common law; and

3.      Counts VII-VIII assert state civil rights claims under Massachusetts law.

Accordingly, Mr. Touponce will employ this three-fold division in the discussion below.

Before addressing the defendants' arguments regarding each of the foregoing claims, it is

necessary to clear up two possible ambiguities in Mr. Touponce's Complaint.  Insofar as such

ambiguity may exist, he attributes it to the Complaint's having been drafted broadly and respectfully asks that it be liberally construed consistent with the "notice pleading" standard set forth in Rule 8 of the Federal Rules of Civil Procedure.  See <u>Bell Atlantic Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 555 & 575 (2007).

First, the defendants have displayed confusion about the relationship among the federal civil rights claims against them.  More particularly, they have charged both that (1) Mr. Touponce cannot "have it both ways" by asserting Mr. Torrico discriminated against him while simultaneously relying upon similar misconduct directed toward others and (2) Count III is "duplicative" of Counts I and II.  See pages 5 and 12 of their Memorandum in Support of their Summary Judgment Motion ("Supporting Memo").  Accordingly, Mr. Touponce wishes to set the record straight on both of those matters.

Despite the superficial appeal of defendants' argument to the contrary, there is nothing mutually inconsistent about asserting *both* that Mr. Torrico discriminated against Mr. Touponce *and* that Mr. Torrico also treated others badly.  It is in fact Mr. Touponce's position that Mr. Torrico behaves ***badly*** toward real estate developers in general, by applying the building and zoning laws to them in an arbitrary and capricious manner, but treats Mr. Touponce ***even worse*** than other developers.  Moreover, he can adduce substantial evidence to support this position. See paragraphs 31-69 of his Response.

The foregoing distinction underlies not merely Mr. Touponce's claims against not only Mr. Torrico but also the Town.  Two separate Town policies are in play.  The first ("the Broad Policy") is a municipal policy of allowing Mr. Torrico to ride roughshod over the rights of real estate developers generally.  The second ("the Narrow Policy") is a municipal policy of allowing Mr. Torrico to engage in a campaign of harassment and discrimination against Mr. Touponce in

4

particular.  It is this dichotomy between the Town's Broad and Narrow Policies, in turn, which provides the key to unlocking the relationship among Mr. Touponce's federal civil rights claims.

Although its prayer for relief asks for judgment against all of the defendants, the gravamen of Count I is clearly directed against Mr. Torrico individually for his selective treatment of Mr. Touponce.  Similarly, although it certainly could have been stated more clearly in the Complaint itself, the dividing line between the claims asserted against the Town in Counts II and III of Mr. Touponce's Complaint is that Count II is premised upon the Narrow Policy, while Count III rests on the Broad Policy.

The second thing Mr. Touponce wishes to clarify is *which claims* are intended to be set forth against *which defendants*.  Read literally, the prayers for relief for all his claims (other than Count II which explicitly adverts only to the Town) requests judgment against all the defendants.  However, read holistically, and with the foregoing in mind:

> Count I (42 U.S.C. § 1983) is meant to sound exclusively against Mr. Torrico in his individual capacity.
>
> Counts II and III (42 U.S.C. § 1983) are intended to sound exclusively against the Town and (to the extent he is its relevant policymaker) Mr. Bailey in his individual capacity.
>
> Counts IV (malicious prosecution) and V (abuse of process) are meant to sound exclusively against Mr. Torrico in his individual capacity.
>
> Count VI (tortious interference with advantageous relations) is intended to sound exclusively against Messrs. Torrico and Bailey in their individual capacities.
>
> Count VII (Massachusetts Civil Rights Act) is meant to sound exclusively against Messrs. Torrico and Bailey in their individual capacities.
>
> Count VIII (Massachusetts Declaration of Rights) is meant to sound against the Town as well as Messrs. Torrico and Bailey in their individual capacities.[1]

---

[1] As a "direct" action, Count VIII is effectively a state-law equivalent to the sort of constitutional claim asserted in Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971).  See, e.g., Phillips v. Youth Development Program, 390 Mass. 652, 658-659 (1983); and Layne v. Superintendent, Mass. Correctional Institute, 406 Mass. 156, 159-160 (1989).

ARGUMENT

Mr. Touponce will now address defendants' arguments as to each claim in turn.[2]

I.  Count I (Violation of 42 U.S.C. § 1983) Against Mr. Torrico

Count I asserts a claim against Mr. Torrico for selective/discriminatory treatment of

Mr. Touponce in violation of 42 U.S.C. § 1983.  In pertinent part, that statute provides:

> Every person who, under color of [state law, deprives] . . . [any]
> person within the jurisdiction [of the United States] . . . of any
> rights, privileges or immunities secured by the Constitution and
> laws [of the United States], shall be liable to the party injured. . . .

Since it is undisputed both that Mr. Torrico was acting "under color of state law" and that

Mr. Touponce is a "person within the jurisdiction of the United States," the only real issue is

whether Mr. Torrico deprived Mr. Touponce of any rights secured by federal law.

In this case, the federal right in question is the right to equal protection of the laws as

guaranteed by the 14th Amendment of the federal Constitution.  More specifically, it is the right

to have the state zoning and building code laws applied to Mr. Touponce in the same fashion as

to other similarly situated individuals.  As the First Circuit has stated:

> Liability in the instant type of equal protection case should depend
> on proof that (1) the person, compared with others similarly
> situated, was selectively treated; and (2) that such selective
> treatment was based on impermissible considerations such as race,
> religion, intent to inhibit or punish the exercise of constitutional
> rights, or malicious or bad faith intent to injure a person.

Yerardi's Moody St. Restaurant v. Bd. of Selectmen, 878 F.2d 16, 21 (1989).

---

[2] While he concedes a "plaintiff is bound by the factual allegations of his complaint," Mr. Touponce rejects the defendants' suggestion that this precludes him from raising "factual allegations which have not been set forth in his complaint."  See page 3 of their Supporting Memo.  Although "he cannot present evidence that *contradicts* his pleadings," Rust v. Tufts University, 1994 Mass. Super. LEXIS 49,* 4 (italics added), that does not mean he may not proffer evidence that explains or elaborates on the allegations in his pleadings.
Indeed, Rust itself emphasizes that Mr. Touponce is entitled to the benefit of all reasonable inferences that may be drawn in his favor from those allegations and/or evidence.  Id. at * 1.

With respect to the first of the preceding elements, Mr. Touponce has presented ample evidence of his "selective treatment" by Mr. Torrico.  See paragraphs 50-88 of the Response.  As for the second, he submits that this selective treatment is predicated upon (1) Mr. Torrico's "malicious or bad faith intent to injure" him as well as (2) the latter's "intent to inhibit or punish" his constitutional rights.[3]

Although a plaintiff "may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that defendant was motivated by a discriminatory animus," Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992), "[d]etermining whether [such animus] was a motivating factor" requires consideration not only of any direct evidence, which is relatively rare, but also "a sensitive inquiry into such circumstantial [evidence] as may be available." Arlington Heights v. Metro. Housing Corp., 429 U.S. 252, 266 (1977).  When doing so, the disproportionate impact of the defendant's actions remains an "important starting point," and "[t]he historical background" in which that conduct took place, and the manner in which it differs from the way he has handled similar cases, may reveal "a clear pattern, unexplainable on grounds other than" invidious discrimination.  Id. at 266-267.  That is precisely what the cumulative effect of Mr. Torrico's actions, viewed in the context in which they were made, does here.  See paragraphs 31-88 of the Response.  Under these circumstances, Mr. Touponce's bid for summary judgment must fail, because adequate grounds exist to permit a reasonable jury to find his conduct did not bear a rational basis to a legitimate governmental purpose.  See Tapalian v. Tusino, 377 F.3d 1, 7 (1st Cir. 2004).

---

[3] More specifically, Mr. Touponce maintains Mr. Torrico has discriminated against him both to retaliate for having successfully employed his rights of legal recourse to resist Mr. Torrico's unreasonable application of the zoning and building code laws in the past and to discourage him (and others) from doing so in the future.  In other words, Mr. Torrico discriminated against Mr. Touponce in order to (a) "get even" with him, (b) force him to "knuckle under" and (c) "make an example of him."

<u>II.  Count II (Violation of 42 U.S.C. § 1983) Against the Town and Mr. Bailey</u>

Count II asserts a claim against the Town and (insofar as he was its policymaker) Mr. Bailey for its custom or policy ("the Narrow Policy") of neglecting or refusing to restrain Mr. Torrico from engaging in, and, indeed, actively encouraging, his selective/ discriminatory treatment of Mr. Touponce in violation of 42 U.S.C. § 1983

Pursuant to <u>Monell</u> v. <u>New York City D.S.S.</u>, 436 U.S. 658 (1978), a municipality may not be held liable for the acts of its rank-and-file employees on a respondeat superior basis under 42 U.S.C. § 1983. <u>Id.</u> at 691-694. Instead, it is only liable when the conduct complained of is fairly attributable to the policy of that municipality and/or the decisions of its policy makers. <u>Id.</u> at 690-691.

Here, the Town has challenged Count II on the ground that it cannot be held liable for Mr. Torrico's acts because (a) there was no "actual written municipal policy" which compelled him to perform the acts complained of and (b) he was not a policymaker for the Town.  See pages 5-8 of defendants' Supporting Memo.  While Mr. Touponce agrees with the first of these premises, he takes issue with the second.  More specifically, he concedes that Mr. Torrico "does not have final policy making authority" for the Town *on paper*, but contends Mr. Torrico enjoys such authority *de facto* because the Town has a custom of blindly deferring to him with respect to his application of the zoning and building codes.  See paragraphs 4-17 of the Response.  It is this blind deference to Mr. Torrico by the Town's *de jure* policymakers which elevates his conduct to the level of municipal policy and distinguishes this case from others in which the isolated actions of rogue employees have been deemed insufficient to justify imposing liability upon the municipality itself pursuant to 42 U.S.C. § 1983.

Unlike the personnel director's misconduct at issue in <u>Smith</u> v. <u>City of Boston</u>, 413 Mass. 607 (1992), all of which occurred over less than a month, <u>id.</u> at 608-609, both the arbitrary and capricious behavior of Mr. Torrico generally ("the Broad Policy") and his campaign of harassment against Mr. Touponce in particular ("the Narrow Policy") transpired over several years. While any single incident might be chalked up to the errant behavior of Mr. Torrico alone, the protracted nature of the vendetta that he has conducted against Mr. Touponce under the cloak of his authority as building inspector and the absence of any effort by his superiors to restrain him belies the Town's belated claim that his misconduct was simply an instance of an individual employee failing to follow established municipal policies. See page 7 of the defendants' Supporting Memo.

The defendants' other three arguments with respect to Count II rest upon a fundamental misreading of Mr. Touponce's Complaint. First, they contend Count II should be dismissed because "there is no Constitutional right to have a local building inspector obtain a search warrant" before entering a property in the performance of his duties. See pages 8-9 of their Supporting Memo.[4] Second, they assert the Massachusetts Tort Claims Act bars that count to the extent it is premised on "negligence" by the Town. See pages 9-10 of their Supporting Memo. Third, and finally, they maintain that the relevant statute of limitations (i.e., Mass. G.L. c. 260, § 2A) precludes that count to the extent it is premised upon a trespass (i.e., warrantless entry upon Mr. Touponce's property by Mr. Torrico) committed prior to March 12, 2005.[5] At the risk of needlessly belaboring matters which are largely (albeit not entirely) irrelevant, Mr. Touponce will now briefly address the most salient points of those arguments below.

---

[4] It is unclear to Mr. Touponce why the defendants are raising this argument in connection with Count II rather than Count I, to which it would appear to be more germane.

[5] See note 4, *supra*.

As a threshold matter, the gravamen of the claims Mr. Touponce has asserted pursuant to 42 U.S.C. § 1983 is **not** Mr. Torrico's warrantless entry upon his property.  Instead, it is the latter's (and, more broadly, the Town's) selective treatment of him.  That is to say, the main focus of Mr. Touponce's § 1983 claims is not the violation of his right to be free from "unreasonable searches and seizures" under the Fourth Amendment, but his right to equal protection under the Fourteenth Amendment.  In a related vein, he is puzzled why the defendants have chosen to construe what is quite clearly a civil rights claim into a common law tort claim for "trespass."  Indeed, the word "trespass" is not mentioned anywhere in the Complaint, much less in Count II.

Nevertheless, in pointing out the preceding facts, Mr. Touponce does not wish to suggest he is abandoning his position that Mr. Torrico's warrantless entry of his property constituted a violation of his civil rights as well as a common law trespass.  Indeed, there is nothing mutually inconsistent about them.  Nor does the fact that equal protection forms the central thrust of his § 1983 claims preclude Mr. Touponce from objecting to Mr. Torrico's warrantless entries upon his property.  Far from being unrelated to his equal protection-based claims, those entries are simply yet another example of the way in which Mr. Torrico has treated him differently than other similarly situated individuals.

More broadly, Mr. Touponce takes issue with defendants' interpretation of Mass. G.L. c. 143, § 50 and 780 C.M.R. §§ 115.6 and 5115.5, which they claim relieves a building inspector of both civil rights (i.e., constitutional) and common law (i.e., trespass) liability for warrantless entry upon a property under the circumstances presented here.  In fact, a close reading of that statute and regulations show they do no such thing.

True, 780 C.M.R. §§ 115.6 and 5115.5 authorize a building inspector to enter upon property in the performance of his duties, and G.L. c. 143, § 50 subjects any person who "hinders or prevents" an inspector from doing so to a fine.  However, just because the owner of a building may incur such a fine by refusing entry does not eliminate the need for the inspector to obtain a warrant before entering where (as here) the owner has specifically denied his consent to that entry via a "no trespass order" pursuant to Mass. G.L. c. 266, § 120.  Indeed, the very fact 80 C.M.R. §§ 115.6 and 5115.5 contemplate the inspector "may seek a search warrant" if an owner refuses entry suggests the inspector *must* obtain such a warrant to avoid committing a civil rights violation and/or trespass.

The only decision that the defendants cite for the proposition that a warrant was unnecessary for Mr. Torrico to enter Mr. Touponce's property is <u>Smith</u> v. <u>City of Boston</u>, 2004 U.S. Dist. LEXIS 13062 (D. Mass.).  Yet that case is readily distinguishable from this by the fact that the circumstances which gave rise to the entry at issue in <u>Smith</u> "clearly constituted an emergency situation," <u>id.</u> at * 11, whereas there has been no such showing in connection with Mr. Torrico's entries upon Mr. Touponce's property.

The defendants are on somewhat firmer ground when asserting that Count II fails to state a claim against the Town "to the extent that [it is premised on the claim that] the Town was negligent."  See page 10 of their Supporting Memo.  Their twin arguments, that "negligence cannot form the basis of a civil rights claim" under 42 U.S.C. § 1983, and that the Massachusetts Tort Claims Act would bar a common law negligence claim against the Town, are well taken.  However, they are also somewhat beside the point, because the major premise (i.e., that negligence forms the gravamen of Count II) underlying those arguments is simply wrong.

True, paragraph 119 of the Complaint does contain an isolated reference to the Town's "*negligent* and intentional acts."  However, paragraphs 115 and 118 make clear that this reference is **not** to garden variety negligence, but to "gross negligence," which is "substantially and appreciably higher in magnitude than ordinary negligence," Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass. App. Ct. 17, 20 n. 7 (1997), and, unlike simple negligence, **can** support a civil rights claim under 42 U.S.C. § 1983.  See Clancy v. McCabe, 441 Mass. 311, 318 (2004) (noting that "gross negligence amounting to deliberate indifference" may suffice to establish liability under § 1983).  Moreover, although the requirements of the Massachusetts Tort Claims Act undoubtedly extend to common law tort claims for gross negligence, McNamara v. Honeyman, 406 Mass. 43, 46 (1989), their sweep does not encompass *civil rights* claims predicated upon gross negligence.  See Mellinger v. West Springfield, 401 Mass. 188, 194-196 (1987).

Finally, two few brief remarks are in order about defendants' assertion that any claim for "a violation of § 1983 based on trespass prior to March 12, 2005 is barred by the three-year statute of limitations as a matter of law."  See page 12 of their Supporting Memo.  First, it bears repeating that trespass is **not** the principal gravamen of Count II, or, indeed, of any of the claims Mr. Touponce has asserted pursuant to 42 U.S.C. § 1983.  See page 10, *supra*.  Second, while it is true that § 1983 claims in Massachusetts are subject to the three-year limitations period set forth in Mass. G.L. c. 260, § 2A,[6] there is abundant evidence of Mr. Torrico's having trespassed upon Mr. Touponce's property on occasions **after** March 12, 2005, and hence less than three years prior before the present action was commenced on March 12, 2008.  See paragraph 22 of the Response.

---

[6] Moreover, this applies not only to § 1983 claims predicated upon trespass, but any other form of misconduct carried out under the color of state law.

### III.  Count III (42 U.S.C. § 1983) Against the Town and Mr. Bailey

Count III asserts a claim against the Town and (insofar as he was its policymaker) Mr. Bailey for its custom or policy ("the Broad Policy") of allowing Mr. Torrico to apply the zoning and building code laws in an arbitrary and capricious manner, thus depriving not only Mr. Touponce but other real estate developers of the equal protection of the law.

Insofar as Count III is premised upon the Broad Policy just described, it is distinguishable from both Counts I (which sounds against Mr. Torrico individually) and II (which is predicated upon the Narrow Policy).  See pages 12-13, *supra*.  As such, it is not "duplicative" of those other counts, despite the defendants' contention to the contrary.

### IV.  Count IV (Malicious Prosecution) Against Mr. Torrico

Count IV asserts a malicious prosecution claim against Mr. Torrico arising out of his involvement in litigation against Mr. Touponce.  More specifically, it is premised upon (1) Mr. Torrico's bringing a Housing Court action (docket no. 04-CV-00274) seeking injunctive relief and the issuance of a criminal complaint against Mr. Touponce with respect to his Silver Street property and (2) the Town's filing a Housing Court action (docket no. 05-CV-00428) seeking injunctive relief against him in connection with his Meadow Street property.  See paragraphs 76-77 and 90 of the Complaint.

Mr. Touponce acknowledges the accuracy of the defendants' recitation of the elements of a malicious prosecution claim (see page 13 of their Supporting Memo) and concedes Mr. Torrico cannot be held liable for bringing a malicious *criminal* prosecution against him (see pages 14-15 of their Supporting Memo) in light of the fact that no criminal complaint ever issued despite Mr. Torrico's request for one vis-à-vis the Silver Street property.  See paragraph 36 of the Concise Statement and Response thereto.

However, an "action for malicious prosecution . . . is not confined to the wrongful initiation of criminal proceedings [but] may be maintained for the unjustifiable initiation of a civil action" as well, Hubbard v. Beatty & Hyde, Inc., 343 Mass. 258, 260-261 (1961), and it is undisputed Mr. Torrico brought the action regarding the Silver Street property.  See paragraph 35 of the Concise Statement and Response thereto.

Mr. Torrico contends Mr. Touponce's malicious prosecution claim vis-à-vis the Silver Street litigation is time-barred by Mass. G.L. c. 260, § 2A because Mr. Touponce did not assert that claim until March 12, 2008, or more than three years after the denial of Mr. Torrico's request for an emergency order to vacate the Silver Street property by the Housing Court on June 30, 2004.  See page 15 of defendants' Supporting Memo.  But this argument overlooks the fact the Housing Court did not dismiss the underlying action until December 6, 2006.  See paragraph 81 of the Complaint and the Answer thereto.

As for the Meadow Street litigation, which was not resolved in Mr. Touponce's favor until January 16, 2008, Mr. Torrico seizes upon the fact that paragraph 90 of the Complaint alleges "the Town" commenced that action and suggests this relieves him of responsibility for its malicious prosecution.  See page 14 of the defendants' Supporting Memo.  Yet liability for malicious prosecution is not limited to the individual that actually brings a particular action, but embraces anyone who "takes an active part" in doing so.  See Restatement (2d) of Torts, § 674, and comment (b) thereto.  Compare Restatement (2d) of Torts, § 653, comment (f).  *Cf.*, Tangney v. Sullivan, 163 Mass. 166 (1895); and Conway v. Smerling, 37 Mass. App. Ct. 1, 4-5 (1994).  Moreover, although Mr. Torrico may not have personally filed the Meadow Street litigation, he did actively participate in its commencement.  See paragraphs 18-30 of the Response.

14

V.  Count V (Abuse of Process) Against Mr. Torrico

Count V asserts an abuse of process claim against Mr. Torrico arising out of his

involvement in both the Silver Street and Meadow Street litigation against Mr. Touponce.  This

count is subject to the same "active participation" standard as Mr. Touponce's claim for

malicious prosecution, so the fact that Mr. Torrico may not have personally filed a particular

action does not insulate him from liability for committing an abuse of process.  Sheraton Boston

Corp. v. Bozzotto, 1995 Mass. Super. LEXIS 602, *11-*13, attached hereto as Addendum A

(citing Alexander v. Unification Church of America, 634 F.2d 673, 678 [2ⁿᵈ Cir. 1980]). *Cf.*,

Leventhal v. Dockser, 358 Mass. 799 (1970); and Guttierez v. Massachusetts Bay Transportation

Auth., 437 Mass. 396, 408-409 (2002).

The defendants maintain neither the Silver Street nor the Meadow Street litigation

supports Count V because "an action seeking an injunction is not 'process' which may properly

form the basis of a claim for abuse of process."  See page 17 of their Supporting Memo.  In

support of that assertion, they cite Jones v. Brockton Public Markets, Inc., 369 Mass. 387 (1975),

which in pertinent part provides:

> [O]ur cases on abuse of process have been limited to three types of
> process: writs of attachment . . .; the process used to institute a
> civil action . . .; and the process related to the bringing of criminal
> charges. . . . Thus, . . . in the context of abuse of process, "process"
> refers to the papers issued by a court to bring a party or property
> within its jurisdiction. . . .

See 369 Mass. at 389-390.  As a result, the Court rejected Jones' suggestion that "an injunction

constitutes 'process' in an action for abuse of process," id. at 390 n. 2, and concluded that his

abuse of process claim should be dismissed for failure to state a claim upon which relief could be

granted because it was predicated solely upon the defendant's advertising of an injunction which it had obtained against him.  Id. at 389 and 390-391.

Contrary to defendants' characterization of Jones, that case does ***not*** stand for the proposition that an action seeking injunctive relief cannot give rise to an abuse of process claim. Instead, it merely establishes that an injunction is not itself the sort of "process" that will support such a claim.  However, instituting the suit in which that injunction is sought *does* constitute process.  See 369 Mass. at 390, identifying "the process used to institute a civil action" as one of the types that may form the basis for an abuse of process claim.  Indeed, the Jones court specifically noted "the only process relevant to this case was that used by the defendant to institute its suit seeking a preliminary injunction," but the plaintiff did not (and could not) claim "the defendant used that process [as opposed to the injunction it advertised] for an ulterior or illegitimate purpose."  Id. at 390-391.

Here, in contrast to Jones, Mr. Touponce is expressly complaining about the process issued upon the commencement of the Silver Street and Meadow Street suits.  The fact that the remedy sought in those suits may have been injunctive relief rather than damages does not alter the fact that the institution of those suits could (and in fact did) constitute an abuse of process. Compare Vittands v. Sudduth, 49 Mass. App. Ct. 401, 406 n. 9 (2000) ("filing a complaint for injunctive and declaratory relief" is the sort of process that can support an abuse of process claim).

As a fallback position, the defendants assert Count V is time-barred under Mass. G.L. c. 260, § 2A.  See page 17 of their Supporting Memo.  As the basis for this claim, they point to Britton v. Thompson, declaring that an action for abuse of process, "[a]s distinguished from a claim for malicious prosecution, . . . accrues on the date the prior proceeding was filed" rather

than when it was disposed of. See 1999 Mass. Super. LEXIS 166, *8 (1999) (citing Quaranto v. Silverman, 345 Mass. 423, 426 [1963]).

Four points are worth noting. First, Britton is only a trial court decision, so this Court has no duty to follow it. Second, Quaranto does not stand for the proposition for which Britton cites it. Indeed, neither Quaranto nor any other Massachusetts appellate decision of which Mr. Touponce is aware addresses when an abuse of process claim should be deemed to accrue for statute of limitations purposes. Third, a minority of extrajurisdictional courts have taken the view that, at least in certain circumstances, a claim for abuse of process "does not mature and no relief can be granted upon it until the merits of the principal action have been determined." See 1 ALR 3d 953, 955-956, *When Statute of Limitations Begins to Run Against Action for Abuse of Process*. Interestingly, Quaranto itself contains some dicta which is supportive of that position. See 345 Mass. at 426 ("The subsequent misuse of the process, though properly obtained,. constitutes the misconduct for which liability is imposed"). Fourth, and finally, even if this Court elects to follow Britton, that decision would not bar Mr. Touponce's abuse of process claim vis-à-vis the Meadow Street litigation, because that suit was not filed until September 9, 2005, or less than three years before the present action was commenced on March 12, 2008. See paragraph 45 of the Concise Statement and Response thereto.

### VI. Count VI (Tortious Interference) Against Messrs. Torrico and Bailey

Count VI asserts a claim against Messrs. Torrico and Bailey for having tortiously interfered with Mr. Touponce's advantageous business relations. It is undisputed that, ordinarily, the *sine qua non* of such a claim is a showing of an intentional interference with plaintiff's business arising "from improper motives or the use of improper means" by the defendants.

<u>United Truck Leasing Corp.</u> v. <u>Geltman</u>, 406 Mass. 811, 815-817 (citing Restatement [2nd] of Torts, §§ 766 and 766B).

However, Mr. Touponce parts ways with the defendants regarding two separate issues. One of them is factual, or more precisely, evidentiary; while the other is purely legal. Mr. Touponce will discuss each of them in turn below.

First, Mr. Touponce disputes defendants' claim that "[t]here is no evidence . . . any of [them] employed improper means or had some improper motive" to interfere with his business. See page 19 of their Supporting Memo.  The same discriminatory animus underlying his equal protection claims (Counts I-III) against Messrs. Torrico and Bailey also supply the "improper means or motive" required for his tortious interference claim (Count VI) against them.  See <u>Lemire</u> v. <u>Silva</u>, 104 F. Supp. 2d 80, 95 (D. Mass. 2000); and <u>Bray</u> v. <u>Community Newspaper, Inc.</u>, 67 Mass. App. Ct. 42, 48 (2006).  Likewise, the same facts giving rise to Mr. Touponce's malicious prosecution and abuse of process claims (Counts IV-V) are also evidence of improper means and/or motive.  See <u>Powers</u> v. <u>Lane</u>, 24 Mass. App. Ct. 381, 385 (1987); <u>G.S. Enterprises, Inc.</u> v. <u>Falmouth Marine, Inc.</u>, 410 Mass. 262, 273 (1991); and <u>Cady</u> v. <u>Marcella</u>, 49 Mass. App. Ct. 334, 342-343 (2000).  Hence, as long as there are grounds to submit Counts I-V to a jury, "it follows that [Count VI] should [be] submitted to a jury in conjunction with them."  <u>Martins</u> v. <u>University of Massachusetts Medical School</u>, 75 Mass. App. Ct. 623, 634 (2009).

In addition to how Mr. Touponce's tortious interference claim is reinforced by his other claims in the manner just noted, there is ample evidence of other ways in which Mr. Torrico has employed improper means to interfere with his business.  To take just one example, consider the misrepresentations that Mr. Torrico made in connection with the Silver Street property.  See paragraph 75 of the Complaint, and paragraphs 73-77 of the Response.

The defendants assert that Mr. Touponce "can point to no statute or regulation prohibiting a Town building official from notifying a realtor when the building official believes that violations existed at a property."  See page 21 of their Supporting Memo.  Yet, in doing so, they misconstrue the nature of the relevant representation underlying Mr. Touponce's tortious interference claim regarding this incident.

Mr. Touponce is *not* complaining about Mr. Torrico's telling to his realtor that a building code violation existed at the Silver Street property when, in fact, one did not.  See paragraphs 80-81 of the Complaint and Answer.  That sort of mistake might conceivably be chalked up to an honest (and perhaps even reasonable) but erroneous belief that the property was being occupied.  However, the gravamen of Mr. Touponce's tortious interference claim relating to this incident stems from an entirely different fact:  i.e., that Mr. Torrico "intentionally and willfully misinformed [the realtor] that the [Silver Street property] could not be sold with a pending violation notice."  See paragraph 75 of the Complaint and paragraph 77 of the Response.  A qualified immunity defense does not apply because it was (and is) "clearly established" that the owner of a property may sell it "subject to" a pending violation notice, such that the buyer will simply have to take corrective action if the building inspector's finding of a violation is upheld.  See Lawton v. Dracousis, 14 Mass. App. Ct. 164, 172-173 (1982).  Or, to put it another way, *even if* there were a bona fide building code violation at the Silver Street property, Mr. Torrico would still be guilty of employing "improper means" to interfere with Mr. Touponce's business by falsely representing to his realtor that the property could not be sold as long as the violation notice was in place.  Compare Petricca v. City of Gardner, 429 F. Supp. 2d 216, 225 (D. Mass. 2006).

Yet another example of conduct outside the scope of any qualified immunity is the suit which the Town filed with respect to Mr. Touponce's compost operation at the Meadow Street property.[7]  Not only did the Housing Court expressly find that the filing of that suit "constituted unreasonable regulation," see paragraph 91 of the Complaint and plaintiff's response to paragraph 47 of defendants' Concise Statement, but there are independent grounds for concluding that it was an unambiguous violation of Mr. Touponce's "clearly established" rights.  To wit, the defendants try to justify the filing of that suit on the ground it was brought to remedy a "violation of the Agricultural Preservation Restriction [('APR')] Agreement" governing the property.  See page 21 of their Supporting Memo.  Yet APR matters are outside the zoning laws, and the Town had no standing to enforce them.  See Prime v. Zoning Bd of Appeals of Norwell, 42 Mass. App. Ct. 796, 803 (1997).  Hence, it follows that the Town's bringing the Meadow Street suit to enforce an APR (which it had no authority to do) under the aegis of its zoning authority constituted an *ipso facto* abuse of process and hence a tortious interference with Mr. Touponce's business as well.

In a similar fashion, when Messrs. Torrico and Nason dealt with Marc Belora, a subcontractor to Tower Acquisitions, LLC, and a tenant of Mr. Touponce's at 190 Housatonic Street, they exerted an obvious chilling effect on Mr. Touponce's relations with Tower.  See paragraph 69 of the plaintiff's Response.  Moreover, their ostensible grounds for doing so (i.e., that each new tenant needed a new site plan review) was revealed to be utterly fallacious when the Zoning Board of Appeals unanimously upheld Mr. Touponce on appeal.  See paragraph 46 of the Complaint and Answer thereto.

---

[7] Although it was the Town which actually filed that action, Mr. Bailey may still be held liable for it to the extent they "took an active part" in initiating that litigation.  See pages 14-15, *supra*.  See also paragraphs 18-29 of the Response.

Second, Mr. Touponce takes issue with the defendants on purely legal grounds with regard to the effect that the qualified immunity defense supposedly has on the basic elements of a tortious interference claim.  They cite <u>EIC Development, LLC</u> v. <u>Mystic Valley Development Commission</u>, 2003 Mass. Super. LEXIS 90, *46, for the proposition that "[a] public official may [be held liable for tortious interference] only when the alleged interference was committed through 'improper means,'" rather than upon a showing of *either* "improper means *or* improper motive."  See page 20 of their Supporting Memo.  Although it may be largely academic because Mr. Touponce believes he can demonstrate *both* improper means *and* improper motive with respect to most (if not all) aspects of his tortious interference claim(s) against Messrs. Torrico and Bailey, he questions whether <u>EIC Development</u> accurately reflects Massachusetts law on the subject.

Since <u>EIC Development</u> is merely a trial court decision, this Court is under no obligation to follow it.  The rule which it purports to enunciate was implicitly rejected by Massachusetts Appeals Court in <u>Cachopa</u> v. <u>Town of Stockbridge</u>, 72 Mass. App. Ct. 657, 661-663 (2008), which applied traditional "improper means or improper motive" analysis to the tortious interference claims asserted against the defendants in that case.  Similarly, the First Circuit held qualified immunity was "of no avail" to the defendant in <u>Newman</u> v. <u>Commonwealth of Massachusetts</u>, 884 F.2d 19 (1989), simply because a "genuine issue of material fact [existed] concerning her motives."  <u>Id.</u> at 27-28.  Any residual uncertainty on this score would appear to be resolved by <u>Shocrylas</u> v. <u>Worcester State College</u>, 2009 U.S. Dist. LEXIS 97292 (D. Mass.), attached hereto as Addendum B, which casts serious doubt on whether the doctrine of qualified immunity even applies to tortious interference claims in the first place.  <u>Id.</u> at *31-*32 n. 22.

### VII.  Count VII (Violation of Massachusetts Civil Rights Act) Against Messrs. Torrico and Bailey

Count VII of the Complaint asserts claims against Messrs. Torrico and Bailey for

violating the Massachusetts Civil Rights Act ("MCRA"), which is codified at Mass. G.L. c. 12,

§§ 11H & 11I.  In pertinent part, those provisions state:

> *§ 11H*:  Whenever any person . . . [interferes or attempts] to interfere by threats, intimidation or coercion , with the exercise or enjoyment of [another person's] rights secured by the constitution or laws of the United States or . . . of the [C]ommonwealth, the attorney general may bring a civil action for . . . appropriate equitable relief. . . .

> *§ 11I*:  Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States or  . . . of the [C]ommonwealth has been interfered with, or attempted to be interfered with, as described in section 11H, may [bring] a civil action for . . . equitable relief [and] compensatory money damages . . . [and if he prevails, may also recover] an award of the costs of the litigation and reasonable attorneys' fees. . . .

The defendants charge Mr. Touponce cannot recover against Messrs. Torrico and Bailey

under Count VII because he is unable to show that they interfered or attempted to interfere with

his civil rights.  See page 24 of their Supporting Memo.  Yet Counts I-III are premised on

precisely such actual and attempted interferences with Mr. Touponce's federal civil rights, and

Count VIII implicates the analogous interference with his Massachusetts civil rights.

Consequently, as long as there is support for any claim against Messrs. Torrico and Bailey under

Counts I-III (see pages 6-13, *supra*) or VIII (see pages 22-24, *infra*), they cannot prevail upon

this aspect of their summary judgment motion as to Count VII.  Tacitly acknowledging as much,

they promptly move on to argue that any such actual or attempted interference with

Mr. Touponce's civil rights was not effected by "threats, intimidation or coercion."  See pages

24-26 of their Supporting Memo.

While Mr. Touponce recognizes "[a] direct violation of a person's rights does not by itself involve threats, intimidation or coercion and thus does not implicate the Act," Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989), he takes issue with defendants' suggestion that "[t]here must be an 'actual or potential *physical* confrontation accompanied by a threat of harm' to prevail on" a claim under the MCRA.  See page 25 of their Supporting Memo. Despite their protests to the contrary, there is ample precedent for the principles that "the MCRA does not always require physical confrontation," see Acciavatti v. Professional Services Group, Inc., 982 F. Supp. 69, 78 (D. Mass. 1997), and "in certain circumstances, economic coercion, standing alone, may be actionable under the Act."  Buster v. George W. Moore, Inc., 438 Mass. 635, 648 (2003).  See also Ayasli v. Armstrong, 56 Mass. App. Ct. 740, 752-753 (2002); Lecrenski Bros., Inc. v. Johnson, 312 F. Supp. 2d 117, 122 (D. Mass. 2004); and Kennie v. Natural Resource Dept. of Dennis, 451 Mass. 754, 763 (2008).  Moreover, it is well established that "non-physical harassment in retaliation for the exercise of a constitutional right can violate the MCRA."  Ali v. University of Massachusetts Med. Ctr., 140 F. Supp. 2d 107, 110 (D. Mass. 2001).

Accordingly, just because he may not allege any physical confrontations with Messrs. Torrico and Bailey is not fatal to Mr. Touponce's MCRA claims against them, since the gravamen of those claim is that they engaged in economic coercion designed both to retaliate against (and make an example of) him for his previous success in defending his rights against their arbitrary and capricious application of the zoning laws and force him to "knuckle under" in the future.  See note 3, *supra*.  Moreover, there is abundant evidence to back up those allegations of retaliation and economic coercion.  See paragraphs 31-88 of the Response.

Finally, to the extent Messrs. Torrico and Bailey claim Mr. Touponce cannot prevail on Count VII because "he never felt threatened, intimidated or coerced" by them, see page 25 of their Supporting Memo, that argument is misplaced for two reasons.  First, the MCRA imposes liability not only for actual but also *attempted* interference with a person's civil rights, so an attempted interference does not need to be successful to be actionable.  Secondly, as the defendants themselves note, "[a]n objective standard is to be used to determine if a reasonable person *in the plaintiff's position* would have been threatened, intimidated or coerced by the defendant's conduct."  See pages 24-25 of their Supporting Memo.  Consequently, the fact Mr. Touponce did not succumb to their coercive efforts because he is exceptionally stubborn does ***not*** relieve them of liability.

<u>VIII.  Count VIII (Violation of Massachusetts Declaration of Rights)</u>
<u>Against the Town and Messrs. Torrico and Bailey</u>

Count VIII of the Complaint asserts claims against the Town and Messrs. Torrico and Bailey for violating Mr. Touponce's rights under both Articles 1 and 10 of the Massachusetts Declaration of Rights.  In pertinent part, those articles declare:

> ***Art. 1***:  All people are born free and equal and have certain natural, essential and unalienable rights, among which [are] the right of enjoying and defending their lives and liberties [and] acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness.  Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin.

> ***Art. 10***:  Each individual . . . has a right to be protected . . . in the enjoyment of his life, liberty and property, according to standing laws.  . . . [N]o part of the property of any individual can, with justice be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people.  . . . And whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor. . . .

The foregoing articles can thus be considered to guarantee three inter-related sets of individual rights:  i.e., (1) the right to due process, (2) the right to equal protection, and (3) the right to be protected from the government taking one's property for purposes other than the "public use" and/or without "reasonable compensation."  Count VIII is intended to invoke all three of these aspects of Articles 1 and 10.  Moreover, as previously noted, that count represents the state law equivalent of a <u>Bivens</u>-style claim.  See note 1, *supra*.

The defendants maintain that a claim under Article 1 is nothing more than an equal protection claim, so Count VIII of Mr. Touponce's Complaint should be dismissed for the same reasons as his equal protection claims (Counts I-III) under 42 U.S.C. § 1983.  See page 27 of their Supporting Memo.  As a threshold matter, Mr. Touponce disagrees with their breezy assertion that Count VIII is "just" an equal protection claim.  As pointed out in the preceding paragraph, that count also implicates the "due process" and "takings" clauses of Articles 1 and 10.[8]  Furthermore, even if this Court were to confine its analysis of Count VIII exclusively to its "equal protection" prong so that it stood or fell along with Counts I-III, Mr. Touponce submits that count would withstand the defendants' summary judgment motion, because Counts I-III are viable.  See pages 6-13, *supra*.

Besides arguing that the fate of Count VIII should be tied to that of Counts I-III, the defendants also make two other veiled "arguments" insinuating reasons why that count should supposedly be dismissed as a matter of law.  Although those arguments are so vague that it is

---

[8] Interestingly, although the defendants contend that Mr. Touponce "cannot maintain his claim for violation of Article 1 . . . as a matter of law," they refrain from making any comparable assertion with respect to his claim for violation of Article 10.  See page 27 of their Supporting Memo.  This fact alone should suffice to justify denying their motion for summary judgment as it relates to Count VIII.

doubtful whether they even deserve the dignity of a direct response, Mr. Touponce will briefly address each of them in turn below.

First, by highlighting the phrase "sex, race, color, creed or national origin" in their recitation of Article 1, see page 26 of their Supporting Memo, the defendants appear to be implying Article 1 only precludes discrimination against those classes.  Yet nothing could be further from the truth.  The guarantee of equal protection afforded by Massachusetts' Constitution, like its federal counterpart, not only prohibits discrimination based on those suspect categories, but any form of differential treatment by the government if it is not rationally related to a legitimate state interest.  See Opinion of the Justices, 368 Mass. 857, 861 (1975); and Marshfield Family Skateland, Inc. v. Marshfield, 389 Mass. 436, 445-446 (1983).  For the reasons previously stated in connection with his analogous claims under 42 U.S.C. § 1983 (see pages 6-13, *supra*), Mr. Touponce submits that he has adduced enough evidence for this aspect of Count VIII to survive summary judgment.

Second, the defendants have invoked the principle that private property rights are "subject to reasonable regulation in the interest of the public health, the public safety, and the public morals."  See page 27 of their Supporting Memo (quoting Commonwealth v. Higgins, 277 Mass. 191, 194 [1931]).  While Mr. Touponce has no quarrel with this general principle in the abstract, the entire thrust of his Complaint is that the defendants' arbitrary and capricious enforcement of the zoning and building code laws has infringed upon his property rights in a manner ***inconsistent with*** the Town's police powers.  See MacNeill v. Avon, 386 Mass. 339, 340-341 (1982) ("A zoning by-law, although valid generally, may be unconstitutional as applied . . . [if it is exercised in a manner that is] clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare").

<u>CONCLUSION</u>

In light of the foregoing, this Court should deny the defendants' Motion for Summary

Judgment.

Dated:  December 17, 2009

THE PLAINTIFF

By his attorneys,


*/s/ Stephen N. Pagnotta*
Stephen N. Pagnotta, BBO No. 387390


*/s/ Michael R. Hinkley*
Michael R. Hinkley, BBO No. 664697
For Donovan & O'Connor, LLP
1330 Mass MoCA Way
North Adams, MA  01247
Tel:  (413) 663-3200
Fax:  (413) 663-7970
email:  mail@docatty.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non registered participants on December 17, 2009.

*/s/ Michael R. Hinkley*

JRL:djb